## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

------------------------------------------------------- x
                                              :
In re:                                        :    Chapter 11
                                              :
VIRGIN ORBIT HOLDINGS, INC., *et al.*,[1]     :    Case No. 23-10405 (___)
                                              :
                     Debtors.                 :    (Joint Administration Requested)
                                              :
------------------------------------------------------- x

**MOTION OF DEBTORS FOR ENTRY OF INTERIM AND FINAL ORDERS (A) AUTHORIZING PAYMENT OF CERTAIN PREPETITION WORKFORCE OBLIGATIONS, (B) AUTHORIZING CONTINUANCE OF WORKFORCE PROGRAMS, (C) AUTHORIZING PAYMENT OF WITHHOLDING AND PAYROLL-RELATED TAXES, (D) AUTHORIZING PAYMENT OF PREPETITION CLAIMS OWING TO ADMINISTRATORS, AND (E) GRANTING RELATED RELIEF**

Virgin Orbit Holdings, Inc. and its debtor affiliates, as debtors and debtors in possession in the above-captioned chapter 11 cases (collectively, the "**Debtors**"), respectfully represent as follows in support of this motion (this "**Motion**"):

## RELIEF REQUESTED

1.      By this Motion, the Debtors seek entry of interim and final orders, substantially in the form attached hereto as **Exhibit A** (the "**Proposed Interim Order**") and **Exhibit B** (the "**Proposed Final Order**" and, together with the Proposed Interim Order, the "**Proposed Orders**"): (a) authorizing, but not directing, the Debtors in their discretion, to pay, continue, or otherwise honor various prepetition labor-related obligations to their Workforce (as defined below); (b) confirming the Debtors' authority to continue each of the Workforce Programs (as defined below) in the ordinary course of business during the Chapter 11 Cases (as defined

---

[1]    The Debtors in these cases, along with the last four digits of each debtor's federal tax identification number, are:  Virgin Orbit Holdings, Inc. (6914); Virgin Orbit National Systems, LLC (3801); Vieco USA, Inc. (0492); Virgin Orbit, LLC (9648); and JACM Holdings, Inc. (1445).  The Debtors' address is 4022 East Conant Street, Long Beach, CA 90808.

below); (c) authorizing the Debtors to pay any and all local, state, and federal withholding and payroll-related or similar taxes and other Deductions (as defined below) relating to the Workforce Obligations; (d) authorizing the Debtors, in their discretion, to pay any prepetition claims owing to the Administrators (as defined below) in the ordinary course of business to ensure the uninterrupted delivery of payments or other benefits to the Workforce; and (e) granting related relief.

2.       The Debtors request authority to pay prepetition obligations related to the Workforce as they become due in the ordinary course of business.  The prepetition amounts sought to be paid by this Motion are discussed in greater detail below and are summarized in the following chart:

| Payment | Approximate Outstanding Prepetition Amount | Approximate Amount Due Within Interim Period |
|---|---|---|
| Workforce Obligations | $5,537,000 | $3,837,000 |
| a.   Wage Obligations | $2,525,000 | $2,025,000 |
| b.   Deductions | $300,000 | $300,000 |
| c.   ESPP | $143,000 | $143,000 |
| d.   Employee Benefits Obligations | $1,119,000 | $1,119,000 |
| e.   PTO Obligations | $1,200,000 | $0 |
| f.   Reimbursable Expense Obligations | $175,000 | $175,000 |
| g.   Miscellaneous Benefits Obligations | $75,000 | $75,000 |
| Administrator Fees and Expenses | $80,000 | $80,000 |
| **TOTAL** | **$5,617,000** | **$3,917,000** |

## JURISDICTION

3.       The Court has jurisdiction to consider this Motion pursuant to 28 U.S.C. §§ 157 and 1334 and the *Amended Standing Order of Reference* from the United States District Court for

the District of Delaware, dated February 29, 2012.  This is a core proceeding pursuant to 28 U.S.C. § 157(b).  Venue is proper before the Court pursuant to 28 U.S.C. §§ 1408 and 1409.

4.  The statutory and legal predicates for the relief requested herein are sections 105(a), 363(b), 363(c), 503(c), 507(a), and 541 of title 11 of the United States Code (the "**Bankruptcy Code**"), Rule 6003 of the Federal Rules of Bankruptcy Procedure (the "**Bankruptcy Rules**"), and Rule 9013-1(f) of the Local Rules of Bankruptcy Practice and Procedure of the United States Bankruptcy Court for the District of Delaware (the "**Local Rules**").

5.  Pursuant to Local Rule 9013-1(f), the Debtors consent to the entry of a final order or judgment by the Court in connection with this Motion if it is later determined that the Court, absent consent of the parties, cannot enter final orders or judgments consistent with Article III of the United States Constitution.

## BACKGROUND

6.  Virgin Orbit was founded in 2017 and specializes in providing launch services for small satellites. Unlike traditional rocket launches that require a launch pad, Virgin Orbit uses a unique air-launch system that allows their rocket, LauncherOne, to be launched from under the wing of a specially modified Boeing 747 aircraft, known as Cosmic Girl.  The air launch system allows for greater flexibility in launch locations and reduces the cost of launching small satellites into space.  The company is primarily located in Long Beach, California with a testing facility in Mojave, California.

7.  On the date hereof (the "**Petition Date**"), the Debtors commenced with the Court voluntary cases (the "**Chapter 11 Cases**") under chapter 11 of the Bankruptcy Code.  The Debtors are authorized to continue operating their business and managing their properties as debtors in

possession pursuant to sections 1107(a) and 1108 of the Bankruptcy Code.  No trustee, examiner, or statutory committee has been appointed in the Chapter 11 Cases.

8.      Contemporaneously with the filing of this Motion, the Debtors have filed with the Court a motion requesting joint administration of the Chapter 11 Cases for procedural purposes only pursuant to Bankruptcy Rule 1015(b).

9.      The factual background regarding the Debtors, including their business operations, their capital and debt structures, and the circumstances leading to the commencement of the Chapter 11 Cases, is set forth in detail in the *Declaration of Daniel Hart in Support of Chapter 11 Petitions and First Day Pleadings (the "***Hart First Day Declaration***")* and the *Declaration of Brian Whittman in Support of Chapter 11 Petitions and First Day Pleadings* (the "***Whittman First Day Declaration****, and, together with the Hart First Day Declaration, the "***First Day Declarations***"),*[2] filed contemporaneously herewith, and are incorporated herein by reference.[3]

## THE DEBTORS' WORKFORCE

10.     As of the Petition Date, the Debtors employ approximately 98 employees (the "**Employees**"), all of which are full-time Employees.  Employees are either salaried ("**Exempt**") or paid hourly ("**Non-Exempt**").  In addition, as of the Petition Date, the Debtors utilized approximately 5 independent contractors and 10 temporary employees (the "**ICs**" and "**Temporary Employees**," respectively, and, collectively the "**Non-Salaried Workers**" and, together with the Employees, the "**Workforce**").  The Debtors source the Temporary Employees

---

[2]   Capitalized terms used but not otherwise defined herein have the meanings ascribed to such terms in the First Day Declarations, as applicable.

[3]   The First Day Declarations and other relevant case information are available on the following website maintained by the Debtors' proposed claims and noticing agent, Kroll Restructuring Administration LLC ("**Kroll**"):  https://cases.ra.kroll.com/virginorbit.

through several agencies (collectively, the "**Staffing Agencies**").  The Workforce is not subject to

a collective bargaining agreement or similar labor agreement and contains no union members.

11.    On March 30, 2023, the Debtors implemented a reduction in force (the "**RIF**")

impacting approximately 671 Employees, or approximately 87% of their Workforce.  Prior to the

RIF, the Debtors employed approximately 769 Employees, 20 ICs, and 37 Temporary Employees.

In connection with the RIF, the Debtors paid all accrued wages, vacation, and cash severance

amounts due under their severance policy to the Employees subject to the RIF and prefunded all

COBRA and outplacement benefits with the associated Administrators (as defined below) using

amounts funded by VIL under the Prepetition Bridge Notes.[4]  Following the RIF, the Debtors have

ceased their launch operations, and retained a core group of Employees to maintain the essential

knowledge to allow business operations to restart at reduced levels once a buyer can be identified.

### THE WORKFORCE OBLIGATIONS

12.    In the ordinary course of business, the Debtors incur various labor-related

obligations (collectively, the "**Workforce Obligations**") under plans, programs, policies, and

agreements maintained by or for the benefit of, or contributed to or entered into by, the Debtors

before the Petition Date (collectively, the "**Workforce Programs**").[5]  The Workforce Obligations

---

[4]    On March 15, 2023, the Debtors' approved a prepetition executive change of control severance plan for certain insider and non-insider Employees, which provided benefits if an Employee is terminated within 12 months following a change of control of:  (a) a cash severance payment equal to 100-200% executive base compensation; (b) a cash payment equal to the executive's pro-rated target annual bonus for the year of termination; (c) up to six months' COBRA coverage; and (d) full accelerated vesting of time-vesting equity awards and accelerated vesting of performance-vesting equity awards.  For the avoidance of doubt, by this Motion, the Debtors are not seeking to pay any prepetition obligations associated with the executive change of control severance plan.

[5]    By this Motion, the Debtors do not seek to assume or reject any Workforce Program to the extent that such Workforce Program is deemed to be an executory contract within the meaning of section 365 of the Bankruptcy Code.  Moreover, the Debtors do not waive their right to modify or terminate any Workforce Program to the extent that such right exists under the terms of the Workforce Program or as may be authorized by applicable law.

are comprised of: (a) wages, salaries, and related compensation (the "**Wage Obligations**"); (b) deductions associated with the Wage Obligations (the "**Deductions**"); (c) obligations stemming from the Debtors' tax-qualified employee stock purchase plan (the "**ESPP**"); (d) various health, financial, and welfare benefits (the "**Employee Benefits Obligations**"); (e) paid time off ("**PTO Obligations**"); (f) reimbursable expenses and related obligations (the "**Reimbursable Expense Obligations**"); and (g) certain miscellaneous Employee benefits payments related to the financial wellness program and mobile cell phone program (the "**Miscellaneous Benefits Obligations**").

13.     By this Motion, the Debtors are seeking authorization to pay the following aggregate amounts on account of the prepetition Workforce Obligations:

| Workforce Obligation | Approximate Outstanding Prepetition Amount | Approximate Amount Due Within Interim Period |
|---|---|---|
| a.   Wage Obligations | $2,525,000 | $2,025,000 |
| b.   Deductions | $300,000 | $300,000 |
| c.   ESPP | $143,000 | $143,000 |
| d.   Employee Benefits Obligations | $1,119,000 | $1,119,000 |
| e.   PTO Obligations | $1,200,000 | $0 |
| f.   Reimbursable Expense Obligations | $175,000 | $175,000 |
| g.   Miscellaneous Benefits Obligations | $75,000 | $75,000 |
| **Total** | **$5,537,000** | **$3,837,000** |

14.     By this Motion, the Debtors also request confirmation of their right to continue to honor and perform their obligations with respect to all of the Workforce Programs.  The Workforce Programs are essential to the Debtors' efforts to maintain Workforce morale, reward performance through certain incentives, minimize attrition, and preserve the ability to maximize the value of the Debtors in a sale process.  The Debtors believe that the expenses associated with the Workforce

Programs are reasonable and cost-efficient in light of the potential attrition, loss of morale, value and productivity, and disruption of business operations that would occur if the Workforce Programs were discontinued.  Notwithstanding the foregoing, the Debtors reserve the right to evaluate all Workforce Programs and to make such modifications, including terminating any particular plan, program, or policy, as may be necessary or appropriate during the Chapter 11 Cases.

## I.    WAGE OBLIGATIONS

15.    The Debtors pay Employees wages and salaries one week in arrears on a bi-weekly basis.  Exempt Employees are salaried.  Non-Exempt Employees are paid on an hourly basis and are eligible for overtime pay at a rate of one and one-half times their regular rate of pay for all hours worked in excess of (a) eight hours per day in any work week up to forty hours per week, or (b) the first eight hours worked on the seventh consecutive day of work in a work week.  Double time is paid to California-based Non-Exempt Employees for all hours worked in excess of twelve hours in any workday or for all hours worked in excess of eight hours on the seventh consecutive day of work in a workweek.  In order to receive overtime pay, Employees must receive prior authorization for any time worked in excess of forty hours per week.  Certain Employees qualify for on-call work, and are reimbursed for reasonable expenses stemming from this type of work.  Prior to the RIF, the average gross payroll on account of Employees for each pay period was approximately $3.6 million.[6]

---

[6]    Prior to the Petition Date, the Debtors also provided certain bonus plans for eligible Employee, including: (a) referral bonuses when a qualified candidate recommended by an Employee was hired by the Debtors; (b) an annual Employee equity program, through which the Debtors granted eligible Employees stock options in return for important contributions to the Debtors' operations; (c) discretionary spot bonus awards granted by Employees' supervisors based on exceptional performance; (d) sign-on bonuses when Employees start their positions; (e) annual cash bonuses based on a variety of factors, including meeting key performance indicators and length of employment; and (f) milestone bonuses when Employees achieve certain orbital launch-related milestones, such as a

16.     The Debtors also make payments on account of their Non-Salaried Workers. Temporary Employees are provided by the Staffing Agencies and the Debtors pay the Staffing Agencies on a quarterly, monthly, weekly, or bi-weekly basis, depending on the agency, on account of the Temporary Employees provided by such Staffing Agency.  The Debtors pay the IC's directly on either a monthly or weekly basis, depending on the IC.  Prior to the RIF, on average, the Debtors would spend approximately $500,000 per month on account of the Non-Salaried Workers.

17.     As of the Petition Date, the Debtors estimate that there is: (a) approximately $825,000 of accrued and unpaid Wage Obligations on account of the Exempt and Non-Exempt Employees, of which approximately $825,000 will become due and owing within the first 30 days after the Petition Date (the "**Interim Period**"); and (b) approximately $1,700,000 of accrued and unpaid Wage Obligations on account of the Non-Salaried Workers, of which approximately $1,200,000 will become due and owing within the Interim Period.

## II.     DEDUCTIONS

18.     In the ordinary course of their business, the Debtors make the Deductions from the Workforce's paychecks for payments to third parties on behalf of members of the Workforce employed in the United States, including for various federal, state, local, income, and social security taxes, court ordered garnishments, savings programs, child support orders, repayments for loans taken against the savings programs, benefit plans, insurance, and other similar programs.

19.     Prior to the RIF, the Debtors' average monthly Deductions totaled approximately $2.7 million.  As of the Petition Date, certain Employees are owed prepetition amounts related to

---

particular number of launches or a significant technical goal.  The Debtors do not intend to honor or continue any such bonus programs during these Chapter 11 Cases, and are not seeking to make any payments in connection with any such bonus programs pursuant to this Motion.

their compensation.  Where such amounts are owed, the applicable Deductions have not yet been taken.  Additionally, the Debtors may not yet have forwarded to the various third parties noted above the payments that are attributable to the Deductions that have been withheld from the Workforces' paychecks.  The Debtors estimate that, as of the Petition Date, accrued, but yet unremitted Deductions total approximately $300,000, approximately all of which will come due and owing within the Interim Period.  By this Motion, the Debtors request authority to remit all amounts that are due and owing on account of Deductions in the ordinary course of business and to pay amounts owed to administrators, UKG ("**UKG**") and Paychex ("**Paychex**"), in connection with the Deductions, and as they become due and owing in the ordinary course of course of business.

### III.    THE ESPP

20.    The Debtors have historically maintained a tax-qualified employee stock purchase plan whereby Employees could elect to have funds deducted from their paychecks to purchase the Debtors' stock at a discount.  The Deductions were held in cash until stock could be purchased and transmitted to the Employees.  Under the ESPP, if an Employee leaves the Debtors' employment prior to the stock being purchased, the Employee's payroll Deductions would be refunded in cash.  If the ESPP is suspended prior to the purchase of stock, the payroll Deductions may be returned to the Employees in cash.  As of the Petition Date, the Company suspended the ESPP and approved the return of payroll Deductions to participating Employees.  Therefore, as of the Petition Date there was approximately $143,000 due to 138 current and former Employees. These funds are wages earned by the Employees and are not property of the Debtors.  Thus, Debtors are seeking authority out of an abundance of caution to return the funds to the Employees.

## IV.   THE EMPLOYEE BENEFITS OBLIGATIONS

21.     The Debtors provide a wide array of benefits for their Employees under a variety of benefit programs (collectively, the "**Employee Benefit Programs**"), which give rise to the Employee Benefits Obligations.  Full-time Employees and part-time Employees who work at least twenty-five hours per week (the "**Eligible Employees**") qualify for all of the Employee Benefit Programs (unless otherwise specified in this Motion).[7]  Eligible Employees may enroll their dependents, including spouses, domestic partners, and children in several of the Employee Benefit Programs.

22.     The Employee Benefit Programs include:  (a) the Medical, Dental, Vision and EAP Plans; (b) Disability Benefits; (c) Flexible Benefits; (d) Savings and Retirement Benefits; and (e) Severance Benefits (each as defined and described below).  The Debtors estimate that as of the Petition Date, there is approximately $1,119,000 accrued and outstanding in connection with the Employee Benefits Obligations, of which approximately $1,119,000 will become due and owing within the Interim Period.  The Debtors also seek authority to, in their sole discretion, continue the Employee Benefit Programs postpetition.

### A.     Medical, Dental, Vision and EAP Plans

#### 1.   Medical Plans

23.     The Debtors' medical coverage includes several plan options in which Eligible Employees may enroll, including medical and prescription drug coverage (the "**Medical Plans**").  The Medical Plans are provided through Cigna Healthcare ("**Cigna**") and Kaiser Foundation Health Plan Inc. ("**Kaiser**", and together with Cigna, the "**Medical Plan Providers**").  The

---

[7]   The Debtors employ Eligible Employees in California, Florida, New York, North Carolina, South Carolina, Texas, Tennessee, Virginia, Nevada, Massachusetts and Washington D.C. and all of the benefits described herein are subject to local and state laws which may require the Debtors to adjust or provide additional benefits under the Employee Benefit Programs.

Debtors generally offer three different levels of coverage under the Medical Plans to Eligible Employees: (a) a preferred provider organization (PPO) plan offered through Cigna; (b) an exclusive provider organization (EPO) plan offered through Cigna; or (c) a health maintenance organization (HMO) plan offered through Kaiser.

24.     The Medical Plans are funded both through Employee contributions and by the Debtors. Approximately 90% of the cost of the Medical Plans is borne by the Debtors, and Employees contribute to the Medical Plans through payroll Deductions to pay for the balance. Employee contributions are deducted from Employee paychecks 24 times per year based on the Employee's payment schedule. Thus, payments to the Medical Plans consist of both trust fund payments (*i.e.*, Employee contributions) and contributions from the Debtors. The Debtors pay the Medical Plan Providers directly for the benefits the Medical Plan Providers actually provide to the Employees for the relevant benefits period. The Debtors' total annual cost related to the Medical Plans, based on the Debtors' most current, pre-RIF enrollment data, is approximately $9.5 million, which is inclusive of premiums and administrative fees.

25.     The Debtors offer all Employees benefits as provided under the Consolidated Omnibus Budget Reconciliation Act of 1985 ("**COBRA**"). Under their severance policy, the Debtors, pays for the first two months of benefits to terminated Employees and Employees are responsible for paying the cost of any further period of time. The American Benefits Group ("**ABG**") is the Administrator of COBRA coverage, with benefits provided by individual healthcare providers.

26.     As of the Petition Date, the Debtors believe that there is approximately $825,000 accrued and outstanding on account of the Medical Benefits. By this Motion, the Debtors request authority to make any payments and remittances for amounts attributable to the prepetition period

and related to the Medical Benefits, in the ordinary course of business and in their sole discretion and to continue the Medical Benefits in the ordinary course of business postpetition.

### 2. Dental Plans

27.      The Debtors offer Eligible Employees three levels of dental care benefits (the "**Dental Plans**").  The Dental Plans are provided through Guardian ("**Guardian**").  The Dental Plans are funded both through Employee contributions and by the Debtors.  Approximately 90% of the cost of the Dental Plans are borne by the Debtors, and Employees contribute to the Dental Plans through payroll deductions to pay for the balance.  Employee contributions are deducted from Employee paychecks 24 times per year based on the Employee's payment schedule.  Thus, payments to the Dental Plans consist of both trust fund payments (*i.e.*, Employee contributions) and contributions from the Debtors.  The Debtors' total annual cost related to the Dental Plans, based on the Debtors' most current, pre-RIF enrollment data, is approximately $725,000, which is inclusive of premiums and administrative fees.  The Debtors pay Guardian directly for the benefits they actually provide to the Employees for the relevant benefits period.

28.      As of the Petition Date, the Debtors believe that there is approximately $70,000 accrued and unpaid owing on account of the Dental Plans.  By this Motion, the Debtors request authority to make all payments and remittances for amounts attributable to the prepetition period and related to the Dental Plans, in the ordinary course of business and in their sole discretion.  The Debtors also request authority to continue the Dental Plans in the postpetition in the ordinary course of business.

### 3. Vision Plans

29.      The Debtors also offer two levels of vision care benefits to Eligible Employees (the "**Vision Plans**").  The Vision Plans are provided through Guardian.  The Vision Plans are funded both through Employee contributions and by the Debtors.  Approximately 50% of the cost

of the Vision Plans is borne by the Debtors, and Employees contribute to the Vision Plans through payroll deductions to pay for the balance. Employee contributions are deducted from Employee paychecks 24 times per year based on the Employee's payment schedule. The Debtors' total annual cost related to the Vision Plans, based on the Debtors' most current, pre-RIF enrollment data, is approximately $125,000, which is inclusive of premiums and administrative fees.

30.    As of the Petition Date, the Debtors believe that there is approximately $12,000 accrued and unpaid owing on account of the Vision Plans. By this Motion, the Debtors request authority to make all payments and remittances for amounts attributable to the prepetition period and related to the Vision Plans, in the ordinary course of business and in their sole discretion. The Debtors also request authority to continue the Vision Plans postpetition in the ordinary course of business.

4.    Employee Assistance Program

31.    Eligible Employees are able to access the employee assistance program ("**EAP**") provided through Integrated Behavioral Health, Inc. (d/b/a Uprise Health) ("**Uprise Health**"). The EAP includes consultative services featuring unlimited, 24/7 telephonic counseling, up to three in-person visits per year, bereavement counseling and resources, tobacco cessation coaching, and other online resources, including for family and caregiving, and health and wellness support. The EAP also includes access to legal and financial assistance with resources such as unlimited telephonic legal support, free consultation with an attorney with discounted services thereafter, an online law library, online self-service legal documents, and financial consultations.

32.    As of the Petition Date, the Debtors believe that there are no accrued and unpaid amounts owing on account of the EAP. By this Motion, the Debtors request authority to make all payments and remittances for amounts attributable to the prepetition period and related to the EAP,

in the ordinary course of business and in their sole discretion.  The Debtors also request authority to continue the EAP postpetition in the ordinary course of business.

### B.    Disability Benefits

33.    The Debtors provide, or in certain cases offer the option of purchasing, certain types of life and disability insurance, including basic life, supplemental life, dependent and spousal life insurance, short-term disability insurance, long-term disability insurance, accidental death and dismemberment insurance, dependent accidental death and dismemberment insurance, critical illness insurance, accident insurance and related programs (collectively, the "**Disability Benefits**"), to all Eligible Employees.  All of the Debtors' Disability Benefits are administered by Guardian.

34.    The Debtors provide basic life insurance coverage to all Eligible Employees through a plan that is 100% funded by the Debtors.  Eligible Employees are entitled to an amount equal to one, two, or four times such Employee's annual earnings under the basic life insurance plan, with a cap of $1,400,000.  The Debtors offer accidental death and dismemberment insurance to all Eligible Employees through a plan that is 100% funded by the Debtors.  Eligible Employees are entitled to an amount equal to one times, two times, or four times such Employee's annual earnings, rounded to the nearest one thousand dollars under the accidental death and dismemberment insurance plan, with a cap of $1,400,000.

35.    In addition, the Debtors offer all Eligible Employees supplemental life insurance coverage and dependent life insurance coverage.  The Debtors also offer dependent accidental death and dismemberment insurance to all Eligible Employees.[8]  The Debtors offer critical illness

---

[8]    Eligible Employees who elect supplemental life insurance coverage can choose a benefit amount ranging from $10,000 to $500,000.   Eligible Employees who elect dependent life insurance or dependent

insurance for specific medical conditions and accident insurance for medical treatments addressing out-of-work accidents.    Supplemental life insurance, dependent life insurance, dependent accidental death and dismemberment insurance, critical illness insurance and accident insurance are 100% funded through Employee contributions and are of no cost to the Debtors.

36.    The Debtors also provide both short and long-term disability coverage for all Eligible Employees through fully-insured plans administered by Guardian.  Short-term disability coverage generally provides 60% of the Employee's base weekly salary for the twelve weeks of leave, with a maximum of $2,000 per week.  Long-term disability provides 60% of the Employee's pre-disability monthly earnings, with a maximum of $15,000 per month.  The total annual cost to the Debtors related to the short and long-term disability coverage, based on the Debtors' most current data, is approximately $225,000 (inclusive of fees paid to Guardian to administer the plans).  The costs of basic life insurance, accidental death and dismemberment insurance and short and long-term disability are also borne entirely by the Debtors.  The remainder of the Disability Benefits are fully funded through Employee contributions.

37.    As of the Petition Date, the Debtors estimate that there is approximately $22,000 outstanding on account of the Disability Benefits (inclusive of fees paid to Guardian to administer the plans).  By this Motion, the Debtors seek authority to make all payments and remittances for amounts attributable to the prepetition period and relating to the Disability Benefits, in the ordinary course of business and in their sole discretion.

### C.    Flexible Benefits

38.    The Debtors offer Eligible Employees the opportunity to establish flexible spending accounts which allow such Employees to set aside pre-tax wages, subject to minimum and

---

accidental death and dismemberment insurance coverage can choose a benefit amount ranging from $5,000 to $250,000 for spouses and $1,000 to $10,000 for children.

maximum annual contributions, to pay for eligible out-of-pocket expenses (the "**FSAs**") using Progressive Benefits Solutions LLC ("**PBS**").  The Debtors also offer general medical FSAs (the "**GMFSAs**") and dependent care FSAs (the "**DCFSAs**").  The GMFSAs allow participating Employees to set aside wages in an account to pay for out-of-pocket health care expenses that are not covered by another health care plan.  The DCFSAs allow participating Employees to set aside wages in an account to pay for dependent care expenses for their spouses, elderly parents, and children.  The Debtors also offer commuter FSAs, which allow Employees to set aside pre-tax wages to pay for public transit or parking.  The Debtors also offer health reimbursement accounts (the "**HRAs**", and together with the FSAs, the GMFSAs, and the DCFSAS, the "**Flexible Benefits**") to their Employees.  If an Eligible Employee opts into one of the Medical Plans, the Debtors will open an HRA for the Employee through PBS, which the Employee can use to cover out-of-pocket health expenses.  Each year, the Debtors will contribute either $1,000, $2,000 or $3,000 depending on how many people receive benefits through the Employee's Medical Plan.

39.     The Debtors withhold Employee contributions to the Flexible Benefits each pay period.  Prior to the RIF, the Debtors remitted to PBS on behalf of participating Employees an average of approximately $40,000 on a monthly basis in connection with the Flexible Benefits, which amounts were withheld from Employee paychecks.  The Debtors pay approximately $3,500 per month to PBS to administer the Flexible Benefits.  As of the Petition Date, the Debtors believe that approximately $130,000 is accrued and to be remitted on account of the Flexible Benefits.  By this Motion, the Debtors request authority to make all payments and remittances for amounts attributable to the prepetition period and related to the Flexible Benefits, in the ordinary course of business and in their sole discretion.  The Debtors also request authority to continue Flexible Benefits postpetition in the ordinary course of business.

**D.     Savings and Retirement Benefits**

40.    Eligible Employees and part-time Employees who work 1,000 or more hours within a calendar year may participate in a 401(k) retirement plan sponsored by the Debtors (the "**401(k) Plan**").  The 401(k) Plan is administered by CMC Interactive LLC ("**CMC**"), and Charles Schwab Trust Bank acts as the 401(k) Plan fiduciary.  Under the 401(k) Plan, an Eligible Employee may contribute a portion of his or her eligible earnings each year.  In addition, under the 401(k) Plan the Debtors will match (a) 3% of an Employee's compensation regardless of if the Employee is contributing to the 401(k) Plan, and (b) 50% of the Employee's contributions up to the first 6% they contribute.  The maximum contribution for both of these contributions is 6% of an Employee's annual compensation.

41.    Prior to the RIF, the Debtors withheld approximately $525,000 per month from Employees participating in the 401(k) Plan.  By this Motion, the Debtors request authority and reserve the right to continue sponsoring the 401(k) Plan to remit all amounts withheld from Employees' paychecks as contributions to the 401(k) Plan, continue the match programs, and to pay any outstanding prepetition 401(k) administrative fees.  The Debtors estimate that, as of the Petition Date, approximately $60,000 on account of Savings and Retirement Benefits for current and former employees including a 2022 true-up associated with the annual audit, approximately all of which will become due and owing within the Interim Period.

**E.     Severance**

42.    The Debtors provide severance pay to all Exempt and Non-Exempt, full-time and part-time Employees upon a qualifying termination of employment or other qualifying event (the "**Severance Benefits**") in accordance with their new severance policy adopted on March 15, 2023.  Severance Benefits are typically provided in exchange for a release of liability for the Debtors.  The Debtors believe it is important that they have the flexibility to maintain their current

30243354.2

practice of providing Severance Benefits for Employee retention and morale.  In the event of an involuntary termination of a member of the Workforce due to reduction in force, downsizing, or job elimination (a "**Termination Event**") such member of the Workforce will be entitled to a severance pay benefit and accrued but unused vacation will be paid out.  The amount of the severance pay benefit payable is based on length of service with the Debtors (or as adjusted through acquisition), job level, and the base pay of the member of the Workforce at the time of termination of employment.  In addition, the severance policy provides for two months of company paid COBRA coverage and outplacement services.

43.    As of the Petition Date, the Debtors have no accrued unpaid liability to former Employees on account of Severance Benefits.  Subject to entry of a final order approving this Motion, the Debtors seek to continue providing postpetition Severance Benefits in the ordinary course of business, to eligible non-insider Employees and certain insider Employees, subject to section 503(c) of the Bankruptcy Code.

## V.    PTO OBLIGATIONS

44.    The Debtors offer the Workforce other forms of compensations, including paid holidays, paid sick and safe leave ("**PSSL**"), vacation time, and other paid and unpaid earned time off (collectively, "**PTO**"), which give rise to the Debtors' PTO Obligations.  Such forms of compensation are customary and necessary in order for maintaining the morale and stability of the Debtors' workforce.

45.    Employees are entitled to fourteen paid holidays per year.  The Debtors have a standard calendar that includes several paid holidays over the course of the year, which varies by the business segment in which the Employees work.  PSSL begins accruing on the first day of work. Each California-based member of the Workforce who works for thirty days or more within a calendar year is entitled to five days of PSSL to be used in that calendar year.  Unused PSSL

days do not carry over from one year to the next. Exempt Employees can use PSSL days in half or full day increments, and Non-Exempt Employees can use PSSL days in thirty minute increments. The Debtors provide up to five days bereavement leave, leave on account of jury duty, up to two hours of paid leave for time spent voting during work hours, and certain caregiver leave, with up to twelve weeks of paid leave for a birth parent, four weeks paid leave for a non-birth parent or for adoption or foster placement, and a paid transitional benefit for a birth and non-birth parent to work part time.

46.    The Debtors also provide Employees with paid vacation time. In general, an Employee's baseline vacation time is based on an Employee's length of service to the Debtors, ranging from fifteen to twenty days for Exempt Employees and ten to fifteen days for Non-Exempt Employees. The maximum amount of vacation Employees can accrue is equivalent to 1.75 times the Employees' individual annual accrual rate. Employees may carry over all unused vacation time from one year to the next. However, if an Employee reaches the maximum accrual balance, the accrual of vacation days will stop until the balance falls below the maximum balance. Employees in California, Massachusetts, and certain other states are entitled to be reimbursed for unused vacation leave upon separation from the Debtors, if the Employee has been employed by the Debtors for one year or more.

47.    In addition to the above, the Debtors provide certain other paid and unpaid leave, as required by federal law and the various state laws in which the Debtors operate, including but not limited to, leave under the (a) Family and Medical Leave Act, (b) New York State Paid Family Leave Act, (c) California Paid Family Leave Law, and (d) Massachusetts Paid Family Leave Law. The type of leave provided under the laws mentioned above and in the other states in which the

30243354.2

Debtors operate differ based on the applicable law, but in each case, the Debtors provide the minimum amount of leave required by such law.

48.     The Debtors estimate that, as of the Petition Date, the aggregate accrued but unpaid PTO Obligations for all Employees total approximately $1.2 million.[9]  Because PTO is an essential feature of the employment package provided to the Debtors' Employees, and failure to provide this benefit would harm Employee morale and encourage the premature departure of valuable Employees, the Debtors request authority to honor all of their PTO Obligations as and when they come due in the ordinary course of business.[10]

## VI.    REIMBURSABLE EXPENSE OBLIGATIONS

49.     In the ordinary course of business, the Debtors routinely reimburse their Employees for business related expenses including, travel, lodging, ground transportation and rental cars, meals, hotel accommodations, mobile phones, Wi-Fi when travelling, and others (collectively, the "**Reimbursable Expenses Obligations**").

50.     The Debtors issue corporate credit cards (the "**Corporate Credit Cards**"), through JP Morgan to certain eligible Employees primarily to pay for Reimbursable Expenses Obligations incurred on behalf of the Debtors in the ordinary course of business.[11]   Alternatively, other

---

[9]   For the avoidance of doubt, all accrued PTO Obligations for former Employees terminated in the RIF were paid in full prior to the Petition Date

[10]   This accrued amount, however, does not represent a true "cash" liability for the Debtors, as the Debtors anticipate that US Employees will use most of their PTO in the ordinary course of business, and eligible US Employees receive cash payments on account of unused earned time off upon termination or resignation, as required by law or contract.  Accordingly, unless a US Employee is terminated or has resigned, PTO is not calculated for the purposes of the statutory priority cap under section 507(a)(4) of the Bankruptcy Code.  Pursuant to this Motion, the Debtors are requesting authority, but not direction, to honor US Employees' ordinary course use of PTO under the PTO policy in existence as of the Petition Date, whether accrued pre- or postpetition, without regard to the statutory cap imposed by section 507(a)(4) of the Bankruptcy Code.

[11]   The Debtors are separately seeking to continue to maintain the Corporate Credit Card program and to pay prepetition amounts owing related to the Corporate Credit Cards pursuant to the *Motion of Debtors*

Employees incur Reimbursable Expenses Obligations individually and seek reimbursement from the Debtors.  Generally, an Employee requesting reimbursement for a Reimbursable Expenses Obligation must submit a request through the Debtors' reimbursement system, Concur Technologies, Inc. ("**Concur**"), within approximately thirty days of incurring the expense.  All claimed Reimbursable Expenses Obligations (whether charged to the Corporate Credit Cards or out-of-pocket), are subject to a review and approval process.  The Debtors estimate that, as of the Petition Date, approximately $175,000 of out-of-pocket Reimbursable Expenses Obligations, including any Reimbursable Expenses Obligations incurred by former Employees terminated in the course of the RIF, not including amounts outstanding on the Corporate Credit Cards, are accrued and unpaid on account of Employee Reimbursable Expenses Obligations, approximately all of which will become due and owing within the Interim Period.

## VII.    MISCELLANEOUS EMPLOYEE BENEFITS

### A.    Financial Wellness Obligations

51.    The Debtors provide Employees with reimbursement for financial wellness courses with state certified financial planning services, as well as advisory and educational sessions covering items such as retirement, tax preparation, budget planning and auto transfer for finances (the "**Financial Wellness Obligations**").  The financial wellness program is provided through Northstar Financial ("**Northstar**").  The Debtors estimate that, as of the Petition Date, approximately $15,000 is accrued and unpaid on account of Financial Wellness Obligations.

---

*for Entry of Interim and Final Orders (I) Authorizing Debtors to (A) Continue Operating Existing Cash Management System, (B) Honor Certain Prepetition Obligations Related Thereto, (C) Maintain Existing Business Forms, and (D) Continue to Perform Intercompany Transactions, (II) Waiving Certain Requirements Under Section 345 of the Bankruptcy Code and the U.S. Trustee Guidelines and (III) Granting Related Relief*, filed contemporaneously herewith.

### B.    Mobile Phone Benefits

52.    The Debtors also pay for and provide mobile phones to certain Employees ("**Mobile Phone Benefits**").    Prior to the RIF, the Debtors paid a phone plan provider approximately $35,000 per month to provide approximately 350 Employees with a mobile phone. As of the Petition Date, the Debtors estimate that there is $60,000 outstanding on account of the Mobile Phone Benefits.    By this Motion, the Debtors seek authority to make all payments and remittances for amounts attributable to the prepetition period and relating to the Financial Wellness Obligations and the Mobile Phone Benefits (together, the "**Miscellaneous Benefits Obligations**"), in the ordinary course of business and in their sole discretion.

## PAYMENTS TO ADMINISTRATORS

53.    With respect to the Workforce Programs described above, the Debtors contract with several vendors, who administer and deliver payments or other benefits to the Workforce including UKG, Paychex, Cigna, Kaiser, ABG, Uprise Health, Guardian, PBS, CMC, Concur, and Northstar (collectively, the "**Administrators**").    The Debtors pay the Administrators certain fees ("**Administrator Fees and Expenses**") in return for their services.

54.    The Debtors' Administrators each provide different and essential services to the Debtors.    For example, (a) UKG and Paychex provide Employee management and payroll services; (b) Cigna and Kaiser provide and administer the Debtors' Medical Plans; (c) ABG provides and administers the Debtors' COBRA coverage; (d) Uprise Health provides and administers the Debtors' EAP; (e) Guardian provides the Debtors with numerous insurance policies and disability benefits; (f) PBS provides and administers the Debtors Flexible Benefits program; (g) CMC provides and administers the Debtors' 401(k) programs; (h) Concur provides and administers employee expense reporting and reimbursement services; and (i) Northstar provides and administers the Debtors' financial wellness courses.    As of the Petition Date, the

Debtors estimate they owe approximately $80,000 to the Administrators, of which approximately $80,000 will come due during the Interim Period.

55.     In conjunction with the Debtors' payment of the Workforce Obligations and continued performance under the Workforce Programs, the Debtors believe that it is necessary to obtain specific authorization to pay any claims of the Administrators on a postpetition basis, including prepetition claims to the extent necessary, to ensure uninterrupted delivery of certain benefits to the Workforce.  The Debtors believe that the Administrators may fail to adequately and timely perform or may terminate their services to the Debtors unless the Debtors pay the Administrators' prepetition claims for administrative services rendered and expenses incurred.  A need to engage replacement Administrators postpetition likely would cause significant disruption to the payment of benefits and other obligations to the Workforce.  Accordingly, the Debtors submit that the payment of claims owed to the Administrators is in the best interest of their estates.

### BASIS FOR RELIEF

I.    **HONORING ALL PREPETITION WORKFORCE OBLIGATIONS IS A SOUND EXERCISE OF BUSINESS JUDGMENT AND THEREFORE SHOULD BE APPROVED**

56.     The Debtors should be authorized to honor all prepetition Workforce Obligations on the terms set forth in the Proposed Orders, as it reflects a sound exercise of their business judgment.  Section 363(b) of the Bankruptcy Code provides, in relevant part, that a debtor "may use, sell, or lease, other than in the ordinary course of business, property of the estate" after notice and a hearing.  11 U.S.C. § 363(b)(1).  Generally, the debtor is only required to "show that a sound business purpose" justifies the proposed use of property.  *In re Montgomery Ward Holding Corp.*, 242 B.R. 147, 153 (D. Del. 1999); *see also In re Phx. Steel Corp.*, 82 B.R. 334, 335–36 (Bankr. D. Del. 1987) (requiring "good business reason" for use under section 363(b) of the Bankruptcy Code).  This standard prohibits other parties from second-guessing the debtor's business judgment

if the debtor has shown that the proposed use will benefit the debtor's estate.  *See In re Johns-Manville Corp.*, 60 B.R. 612, 616 (Bankr. S.D.N.Y. 1986) ("Where the debtor articulates a reasonable basis for its business decisions (as distinct from a decision made arbitrarily or capriciously), courts will generally not entertain objections to the debtor's conduct."); *see also In re Tower Air, Inc.*, 416 F.3d 229, 238 (3d Cir. 2005) ("Overcoming the presumptions of the business judgment rule on the merits is a near-Herculean task.").

57.     For the reasons discussed herein, paying the prepetition Workforce Obligations reflects a sound exercise of business judgment.  If the Debtors do not pay the prepetition Workforce Obligations, their business and operations will suffer from further falling morale and likely losses of key members of the limited remaining Workforce, all at the most inopportune moment as the Debtors transition into chapter 11 and work to maximize and preserve value.  On the other hand, demonstrating the Debtors' commitment to their Workforce will mitigate the impact of the RIF and allow the Debtors to maintain the core group of staff necessary to market the business and allow a potential buyer to restart operations in the future.  Therefore, the Debtors submit that this Court should authorize the relief requested in this Motion.

## II.     HONORING ALL PREPETITION WORKFORCE OBLIGATIONS IS NECESSARY TO THE SUCCESS OF THE CHAPTER 11 CASES AND THEREFORE SHOULD BE APPROVED

58.     In addition, the Debtors should be authorized to honor the prepetition Workforce Obligations as set forth in the Proposed Orders because doing so is necessary to the success of their reorganization and sale process.  Section 105(a) of the Bankruptcy Code provides that a bankruptcy court "may issue any order, process, or judgment that is necessary or appropriate to carry out the provisions" of the Bankruptcy Code.  11 U.S.C. § 105(a).  Courts have interpreted this provision to authorize payments on prepetition claims where the payments are essential to the success of the debtor's reorganization under what is known as the "necessity of payment doctrine."

*See In re Lehigh & New Eng. Ry.*, 657 F.2d 570, 581 (3d Cir. 1981) ("Thus, the 'necessity of payment' doctrine . . . teaches no more than, if a payment of a claim which arose prior to reorganization is essential to the continued operation of the [debtor's business] during reorganization, payment may be authorized . . . ."); *see also In re Just for Feet, Inc.*, 242 B.R. 821, 824–25 (D. Del. 1999) (holding that section 105(a) "provides a statutory basis for payment of pre-petition claims" under necessity of payment doctrine); *In re Columbia Gas Sys., Inc.*, 171 B.R. 189, 191–92 (Bankr. D. Del. 1994) ("The appropriate standard . . . is commonly referred to as 'the necessity of payment doctrine.'").

59.     Paying the prepetition Workforce Obligations is a necessary step for the Debtors to achieve a successful sale process and/or restructuring. The Workforce is a fundamental building block of the Debtors' operations, from the engineers designing and manufacturing the machinery and software used to launch satellites to finance, IT, and human resources staff necessary to operate and support those activities. For every member of the Workforce, resignation or just flagging performance as a result of failing to pay the prepetition Workforce Obligations has the potential to harm the value of the Debtors' estates and reduce the likelihood of a successful sale or reorganization—this is particularly true following the Debtors' post-RIF reduced Workforce. Accordingly, the Debtors should be authorized to pay the prepetition Workforce Obligations under section 105(a) of the Bankruptcy Code and the necessity of payment doctrine.

## III.     PAYMENT OF THE PRIORITY PORTION OF THE PREPETITION WORKFORCE OBLIGATIONS WILL NOT PREJUDICE CREDITORS

60.     Sections 507(a)(4) and 507(a)(5) of the Bankruptcy Code require that certain claims for prepetition wages, salaries, commissions, vacation, severance, sick leave, sales commissions, and employee-benefit contributions be accorded priority in payment in an amount not to exceed $15,150 for each individual. *See* 11 U.S.C. §§ 507(a)(4), (5). In chapter 11 cases, priority claims

must be paid in full.  Accordingly, granting the relief requested with respect to the priority portion of the prepetition Workforce Obligations will not adversely affect the Debtors' other unsecured creditors.

61.    The Debtors do not believe that any individual Employee is owed prepetition amounts in excess of the priority cap, with the exceptions as outlined herein with respect to certain PTO Obligations.  The amounts of certain prepetition Workforce Obligations are unknown pending submission of claims, and, therefore, the Debtors do not know the exact amount due on account of each Employee and IC for the prepetition period.  To the extent that Employees or ICs are owed aggregate amounts in excess of the priority cap, or amounts that are otherwise not entitled to priority status, the Debtors submit that payment of the prepetition Workforce Obligations in such higher amounts or otherwise non-priority amounts is nonetheless justified under the authority discussed above.

## IV.    CERTAIN PREPETITION WORKFORCE OBLIGATIONS ARE REQUIRED TO BE PAID BY LAW

62.    The Debtors are subject to federal and state laws that require them to pay certain of the prepetition Workforce Obligations or risk suit or cancellation of their qualification to operate in certain jurisdictions.  Foremost, deductions on account of income tax withholdings obligations are derived from Employee funds and held in trust for the benefit of the related payees and, thus, do not constitute property of the Debtors' estates under section 541 of the Bankruptcy Code.  *See Begier v. IRS*, 496 U.S. 53, 58–59 (1990); *see also In re Columbia Gas Sys., Inc.*, 997 F.2d 1039, 1059 (3d Cir. 1993) (concluding that property that debtor holds in trust—either express or constructive—does not become property of estate when debtor files for bankruptcy, and stating that "Congress clearly intended the exclusion by section 541(d) to include not only funds held in express trust, but also funds held in constructive trust"); *EBS Pension L.L.C. v. Edison Bros.*

*Stores, Inc. (In re Edison Bros., Inc.)*, 243 B.R. 231, 235 (Bankr. D. Del. 2000) (same).  Thus, the Debtors should be authorized to pay such deductions regardless of when those deductions accrued or were withheld.

**V.     CERTAIN PREPETITION EMPLOYEE BENEFIT OBLIGATIONS SHOULD BE APPROVED AS TO THE DEBTORS' INSIDERS PURSUANT TO SECTION 503(C)(2) OF THE BANKRUPTCY CODE.**

63.     Sections 503(c)(2) of the Bankruptcy Code provides, in pertinent part, that severance payments shall not be made to insiders of a debtor unless "(A) the payment is part of a program that is generally applicable to all full-time employees; and (B) the amount of the payment is not greater than 10 times the amount of the mean severance pay given to nonmanagement employees during the calendar year in which the payment is made . . . ."  11 U.S.C. § 503(c)(2).

64.     The Severance Benefits to insiders meet the standards set forth in section 503(c)(2). The Debtors provide severance to all Exempt and Non-Exempt full-time and part-time Employees upon the occurrence of a Termination Event.  As such, the Severance Benefits are being offered to all full-time employees, and section 503(c)(2)(A) is satisfied.  *See also In re Forum Health*, 427 B.R. 650 (Bankr. N.D. Ohio 2010) (finding that section 503(c)(2) requires that a severance program be applicable to *all* full-time employees).  With respect to section 503(c)(2)(B), the amount to be paid to each insider of the Debtors does not exceed ten (10) times the amount of the mean severance offered to any other non-insider employees.  Accordingly, the Severance Payments also satisfy the requirements of section 503(c)(2)(B) and, thus, should be authorized.

**DEBTORS' BANKS SHOULD BE AUTHORIZED TO**
**HONOR CHECKS AND ELECTRONIC FUNDS TRANSFERS**

65.     The Debtors further request that the Court (a) authorize all applicable financial institutions (collectively, the "**Banks**") to receive, process, honor, and pay all checks presented for payment and electronic payment requests relating to the relief sought herein to the extent that the

Debtors have sufficient funds on deposit in their accounts with the Banks, whether such checks were presented or electronic requests were submitted before or after the Petition Date, and (b) authorize the Banks to rely on the Debtors' designation of any particular check or electronic payment request as appropriate pursuant to this Motion without any duty of further inquiry and without liability for following the Debtors' instructions. The Debtors anticipate having sufficient funds to pay the amounts described herein. In addition, under the Debtors' existing cash management system, the Debtors can readily identify whether checks or wire transfer requests are payments authorized by the relief requested herein. Accordingly, the Debtors believe that checks, direct debits, or wire transfer requests, other than those relating to authorized payments, will not be honored inadvertently.

**BANKRUPTCY RULE 6003 HAS BEEN SATISFIED**
**AND BANKRUPTCY RULE 6004 SHOULD BE WAIVED**

66.     Certain aspects of the relief requested herein may, if granted, be subject to Bankruptcy Rule 6003, which governs the availability of certain types of relief within 21 days after the Petition Date. Pursuant to Bankruptcy Rule 6003, a court may grant such relief if it is necessary to avoid immediate and irreparable harm. The Debtors submit that the facts set forth herein and in the First Day Declaration demonstrate that the relief requested is necessary to avoid immediate and irreparable harm to the Debtors and, thus, Bankruptcy Rule 6003 has been satisfied.

67.     Additionally, to the extent that any aspect of the relief sought herein constitutes a use of property under section 363(b) of the Bankruptcy Code, the Debtors seek a waiver of the notice requirements under Bankruptcy Rule 6004(a), to the extent not satisfied, and of the 14 day stay under Bankruptcy Rule 6004(h). As described above, the relief that the Debtors seek in this Motion is immediately necessary in order for the Debtors to be able to continue to operate their business and preserve the value of their estates. Accordingly, the Debtors submit that the requested

waiver of the notice requirements of Bankruptcy Rule 6004(a) and of the 14-day stay imposed by

Bankruptcy Rule 6004(h) is appropriate.

## **RESERVATION OF RIGHTS**

68.     Nothing contained in this Motion or any order granting the relief requested in this

Motion, and no action taken pursuant to such relief requested or granted (including any payment

made in accordance with any such order), is or should be construed or deemed to be: (a) an

admission as to the validity of any claim against the Debtors or the existence of any lien against

the Debtors' property; (b) a waiver of the Debtors' rights to dispute any claim or lien on any

grounds; (c) a promise to pay any claim; (d) an implication or admission that any particular claim

would constitute an allowed claim; (e) an assumption or rejection of any executory contract or

unexpired lease pursuant to section 365 of the Bankruptcy Code; (f) a limitation on the Debtors'

rights under section 365 of the Bankruptcy Code to assume or reject any executory contract with

any party subject to the Proposed Orders once entered; or (g) a waiver or limitation of any claims,

causes of action or other rights of the Debtors, or any other party in interest against any person or

entity under the Bankruptcy Code or any other applicable law.  Nothing contained in the Proposed

Orders will be deemed to increase, reclassify, elevate to an administrative expense status, or

otherwise affect any claim to the extent it is not paid.

## **NOTICE**

69.     Notice of this Motion will be provided to (a) the Office of the United States Trustee

for the District of Delaware; (b) the holders of the 30 largest unsecured claims against the Debtors;

(c) counsel to the DIP Secured Parties; (d) the holder of the Debtors' secured convertible notes;

(e) the holder of the Debtors' unsecured convertible debenture; (f) the Administrators; (g) the

United States Attorney's Office for the District of Delaware; (h) the Internal Revenue Service;

(i) the United States Securities and Exchange Commission; (j) the Banks; and (k) any party that

has requested notice pursuant to Bankruptcy Rule 2002. As this Motion is seeking "first day" relief, the Debtors will serve copies of this Motion and any order entered in respect of this Motion as required by Local Rule 9013-1(m). The Debtors believe that no further notice is required.

70. A copy of this Motion is available on (a) the Court's website, at www.deb.uscourts.gov, and (b) the website maintained by the Debtors' proposed Claims and Noticing Agent, Kroll, at https://cases.ra.kroll.com/virginorbit/.

*[Remainder of page intentionally left blank.]*

WHEREFORE the Debtors respectfully request entry of the Proposed Orders granting the

relief requested herein and such other and further relief as the Court may deem just and appropriate.

Dated:  April 4, 2023
       Wilmington, Delaware

**YOUNG CONAWAY STARGATT & TAYLOR, LLP**

*/s/ Allison S. Mielke*_____
Robert Brady (No. 2847)
Michael R. Nestor (No. 3526)
Kara Hammond Coyle (No. 4410)
Allison S. Mielke (No. 5934)
Rodney Square, 1000 North King Street
Wilmington, Delaware 19801
Telephone:  (302) 571-6600
Facsimile:  (302) 571-1253
Email:  rbrady@ycst.com
        mnestor@ycst.com
        kcoyle@ycst.com
        amielke@ycst.com

-and-

**LATHAM & WATKINS LLP**

Jeffrey E. Bjork (*pro hac vice* admission pending)
355 South Grand Avenue, Suite 100
Los Angeles, California 90071
Telephone:  (213) 485-1234
Facsimile:  (213) 891-8763
Email:  jeff.bjork@lw.com


George Klidonas (*pro hac vice* admission pending)
Anupama Yerramalli (*pro hac vice* admission pending)
Liza L. Burton (*pro hac vice* admission pending)
1271 Avenue of the Americas
New York, NY 10020
Telephone: (212) 906-1200
Facsimile: (212) 751-4864
Emails: george.klidonas@lw.com
       anu.yerramalli@lw.com
       liza.burton@lw.com

*Proposed Counsel for Debtors and Debtors in Possession*

30243354.2

**EXHIBIT A**

**Proposed Interim Order**

**IN THE UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF DELAWARE**

---------------------------------------------------------- x
                                          :
In re:                                    :    Chapter 11
                                          :
VIRGIN ORBIT HOLDINGS, INC., *et al.*,[1] :    Case No. 23-10405 (___)
                                          :
                Debtors.                  :    (Jointly Administered)
                                          :
---------------------------------------------------------- x    **Re: Docket No. _____**

**INTERIM ORDER (A) AUTHORIZING PAYMENT OF CERTAIN
PREPETITION WORKFORCE OBLIGATIONS, (B) AUTHORIZING
CONTINUANCE OF WORKFORCE PROGRAMS, (C) AUTHORIZING
PAYMENT OF WITHHOLDING AND PAYROLL-RELATED TAXES,
(D) AUTHORIZING PAYMENT OF PREPETITION CLAIMS OWING TO
ADMINISTRATORS, AND (E) GRANTING RELATED RELIEF**

Upon consideration of the motion (the "**Motion**")[2] of the above-captioned debtors and

debtors in possession (collectively, the "**Debtors**") for entry of orders (a) authorizing, but not

directing, the Debtors, in their discretion, to pay, continue, or otherwise honor the Workforce

Obligations, (b) confirming the Debtors' authority to continue each of the Workforce Programs in

the ordinary course of business, (c) authorizing the Debtors to pay any and all local, state, and

federal withholding and payroll-related or similar taxes and other Deductions relating to the

Workforce Obligations, (d) authorizing the Debtors, in their discretion, to pay any prepetition

claims owing to the Administrators in the ordinary course of business, and (e) granting related

relief, all as more fully set forth in the Motion; and this Court having reviewed the Motion and the

---

[1]    The Debtors in these cases, along with the last four digits of each debtor's federal tax identification number, are:  Virgin Orbit Holdings, Inc. (6914); Virgin Orbit National Systems, LLC (3801); Vieco USA, Inc. (0492); Virgin Orbit, LLC (9648); and JACM Holdings, Inc. (1445).  The Debtors' address is 4022 East Conant Street, Long Beach, CA 90808.

[2]    Capitalized terms used but not otherwise defined herein have the meanings ascribed to such terms in the Motion.

First Day Declaration; and this Court having jurisdiction to consider the Motion and the relief requested therein in accordance with 28 U.S.C. §§ 157 and 1334 and the *Amended Standing Order of Reference* from the United States District Court for the District of Delaware, dated February 29, 2012; and this Court having found that this is a core proceeding pursuant to 28 U.S.C. § 157(b)(2) and that this Court may enter a final order consistent with Article III of the United States Constitution; and this Court having found that venue of this proceeding and the Motion in this district is proper pursuant to 28 U.S.C. §§ 1408 and 1409; and it appearing that proper and adequate notice of the Motion has been given and that no other or further notice is necessary, except as set forth in the Motion with respect to entry of this Interim Order and notice of the Final Hearing (as defined below); and upon the record herein; and after due deliberation thereon; and this Court having determined that there is good and sufficient cause for the relief granted in this Interim Order, therefore, it is hereby

**ORDERED, ADJUDGED AND DECREED THAT:**

1.      The Motion is granted on an interim basis, as set forth herein.

2.      All objections to the entry of this Interim Order, to the extent not withdrawn or settled, are overruled.

3.      The Debtors are authorized but not directed, in their discretion and business judgment, to pay or otherwise honor all prepetition (a) Workforce Obligations and (b) Administrator Fees and Expenses on an interim basis, provided such payments shall not exceed the amounts set forth in the table below in the aggregate without further order of this Court.

| Obligation | Approximate Interim Amounts |
|---|---|
| **Workforce Obligations** | $3,837,000 |
|    a.  Wage Obligations | $2,025,000 |
|    b.  Deductions | $300,000 |
|    c.  ESPP | $143,000 |
|    d.  Employee Benefits Obligations | $1,119,000 |
|    e.  PTO Obligations | $0 |
|    f.  Reimbursable Expense Obligations | $175,000 |
|    g.  Miscellaneous Benefits Obligations | $75,000 |
| **Administrator Fees and Expenses** | $80,000 |
| **GRAND TOTAL** | **$3,917,000** |

4.      The Debtors are authorized to (a) continue each of the Workforce Programs, in the ordinary course of business during the Chapter 11 Cases in the manner and to the extent that such Workforce Programs were in effect, as described in the motion, immediately before the filing of the Chapter 11 Cases, and (b) continue to fund and to make payments in connection with the costs of and the expenses incurred in the administration of any Workforce Program in the ordinary course of business; *provided, however*, that the Debtors shall not make any payments in connection with the Severance Benefits absent further order of this Order.

5.      The Debtors are authorized but not directed to pay any and all local, state, and federal withholding and payroll-related or similar taxes related to their prepetition Workforce Obligations and to withhold and pay amounts that are attributable to the Deductions, including, but not limited to, all withholding taxes, social security taxes, and Medicare taxes, whether such taxes relate to the period before or after the Petition Date.

6.      Notwithstanding any other provision of this Interim Order, no payments to or on behalf of any individual Employee or Temporary Employee on account of pre-petition obligations shall exceed the amounts set forth in 11 U.S.C. §§ 507(a)(4) and 507(a)(5).

30243354.2

3

7.        Nothing herein shall be deemed to (a) authorize the payment of any amounts (i) in satisfaction of any bonus or severance obligation, or (ii) which are subject to section 503(c) of the Bankruptcy Code; or (b) authorize the Debtors to cash out any PSSL or PTO time except upon termination of an Employee, if applicable state law requires such payment.

8.        The Debtors shall provide schedules to the Office of the United States Trustee for the District of Delaware, counsel to any statutory committee appointed in these Chapter 11 Cases, and counsel to the DIP Secured Parties of all payments made on account of all prepetition Workforce Obligations and Administrator Fees and Expenses made by the Debtors pursuant to this Interim Order and within 30 days of any such payment.

9.        The Banks shall be, and are hereby authorized, when requested by the Debtors, to process, honor, pay, and, if necessary, reissue any and all checks or electronic funds transfers, on account of obligations authorized to be paid by this Interim Order, including prepetition checks and electronic payment and transfer requests that the Debtors reissue or re-request postpetition, drawn on the Debtors' accounts, whether those checks were presented before or after the Petition Date, provided that sufficient funds are available in such accounts to make the payments.

10.        The Banks may rely on the representations of the Debtors with respect to whether any check or other transfer drawn or issued by the Debtors before the Petition Date should be honored pursuant to this Interim Order, and the Banks shall not have any liability to any party for relying on such representations by the Debtors as provided for in this Interim Order.

11.        The Debtors are authorized but not directed to issue new postpetition checks, or effect new electronic funds transfers on account of amounts payments authorized to be made by this Interim Order, to replace any prepetition checks or electronic fund transfer requests that may be lost or dishonored as a result of the commencement of the Chapter 11 Cases.

12.    Any authorization under this Interim Order to pay, and the payment of, any amounts on account of the Workforce Obligations shall not affect the Debtors' right to contest the amount or validity of any Workforce Obligation, including without limitation, any amounts that may be due to any taxing authority.

13.    Notwithstanding anything to the contrary in this Interim Order, the Debtors retain their right to modify or terminate any Workforce Program to the extent that such right exists under the terms of the Workforce Program or as may be required by applicable law; *provided, however*, that the Debtors shall seek court approval, upon a motion on notice, of any modification that would implicate any portion of section 503(c) of the Bankruptcy Code

14.    Nothing in the Motion or this Interim Order, nor any actions or payments made by the Debtors pursuant to this Interim Order, is intended as or shall be construed or deemed to be: (a) an admission as to the validity of any claim against the Debtors or the existence of any lien against the Debtors' properties; (b) a waiver of the Debtors' rights to dispute any claim or lien on any grounds; (c) a promise to pay any claim; (d) an implication or admission that any particular claim would constitute an allowed claim; (e) an assumption or rejection of any executory contract or unexpired lease pursuant to section 365 of the Bankruptcy Code; (f) a limitation on the Debtors' rights under section 365 of the Bankruptcy Code to assume or reject any executory contract with any party subject to this Interim Order; or (g) a waiver or limitation of any claims, causes of action or other rights of the Debtors, or any other party in interest against any person or entity under the Bankruptcy Code or any other applicable law.  Nothing contained in this Interim Order shall be deemed to increase, decrease, reclassify, elevate to an administrative expense status, or otherwise affect any claim to the extent it is not paid.

15.     Notwithstanding Bankruptcy Rule 6004(h), to the extent applicable this Interim Order shall be effective and enforceable immediately upon entry hereof.

16.     The requirements set forth in Bankruptcy Rule 6004(a) are hereby waived.

17.     The requirements set forth in Bankruptcy Rule 6003(b) are satisfied because the relief set forth in this Interim Order is necessary to avoid immediate and irreparable harm.

18.     The Debtors are hereby authorized to take such actions and to execute such documents as may be reasonably necessary to implement the relief granted by this Interim Order.

19.     The final hearing (the "**Final Hearing**") on the Motion shall be held on _____, 2023, at _____, prevailing Eastern Time.  On or before _____, prevailing Eastern Time, on _____, 2023, any objections or responses to entry of a final order on the Motion (a "**Final Order**") shall be filed with this Court, and served on:  (a) Virgin Orbit Holdings, Inc., 4022 East Conant Street, Long Beach, CA 90808, Attn: Derrick Boston (derrick.boston@virginorbit.com); (b) proposed counsel to the Debtors and Debtors in Possession, (i) Latham & Watkins LLP, (1) 355 South Grand Avenue, Suite 100, Los Angeles, California 90071 (Attn: Jeffrey E. Bjork (jeff.bjork@lw.com)) and (2) 1271 Avenue of the Americas, New York, NY 10020 (Attn: George Klidonas (george.klidonas@lw.com), Anupama Yerramalli (anu.yerramalli@lw.com), and Liza L. Burton (liza.burton@lw.com)); and (ii) Young Conaway Stargatt & Taylor, LLP, Rodney Square, 1000 North King Street, Wilmington, Delaware 19801 (Attn:  Kara Hammond Coyle (kcoyle@ycst.com) and Allison S. Mielke (amielke@ycst.com)); (c) counsel to DIP Secured Parties, Davis Polk & Wardwell LLP, 450 Lexington Avenue, New York, New York 10017 (Attn: Brian M. Resnick (brian.resnick@davispolk.com), Josh Sturm (joshua.sturm@davispolk.com) and Jarret Erickson jarret.erickson@davispolk.com)); (c) counsel to any statutory committee appointed in the Chapter 11 Cases; and (d) the Office of the United

States Trustee for the District of Delaware, 844 King Street, Suite 2207, Lockbox 35, Wilmington, Delaware 19801 (Attn: Juliet Sarkessian (juliet.m.sarkessian@usdoj.gov)).   In the event that no objections to entry of the Final Order are timely received, this Court may enter such Final Order without need for the Final Hearing.

20.     This Court retains exclusive jurisdiction with respect to all matters arising from or related to the implementation, interpretation, and enforcement of this Interim Order.

# **EXHIBIT B**

## **Proposed Final Order**

## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

```
-------------------------------------------------------- x
                                                         :
In re:                                                   :   Chapter 11
                                                         :
VIRGIN ORBIT HOLDINGS, INC., et al.,¹                    :   Case No. 23-10405 (___)
                                                         :
            Debtors.                                     :   (Jointly Administered)
                                                         :
-------------------------------------------------------- x   Re: Docket Nos.: _____ & _____
```

## FINAL ORDER (A) AUTHORIZING PAYMENT OF CERTAIN PREPETITION WORKFORCE OBLIGATIONS, (B) AUTHORIZING CONTINUANCE OF WORKFORCE PROGRAMS, (C) AUTHORIZING PAYMENT OF WITHHOLDING AND PAYROLL-RELATED TAXES, (D) AUTHORIZING PAYMENT OF PREPETITION CLAIMS OWING TO ADMINISTRATORS, AND (E) GRANTING RELATED RELIEF

Upon consideration of the motion (the "**Motion**")² of the above-captioned debtors and debtors in possession (collectively, the "**Debtors**") for entry of orders (a) authorizing, but not directing, the Debtors, in their discretion, to pay, continue, or otherwise honor the Workforce Obligations, (b) confirming the Debtors' authority to continue each of the Workforce Programs in the ordinary course of business, (c) authorizing the Debtors to pay any and all local, state, and federal withholding and payroll-related or similar taxes and other Deductions relating to the Workforce Obligations, (d) authorizing the Debtors, in their discretion, to pay any prepetition claims owing to the Administrators in the ordinary course of business, and (e) granting related relief, all as more fully set forth in the Motion; and this Court having reviewed the Motion, the

---

[1]   The Debtors in these cases, along with the last four digits of each debtor's federal tax identification number, are:  Virgin Orbit Holdings, Inc. (6914); Virgin Orbit National Systems, LLC (3801); Vieco USA, Inc. (0492); Virgin Orbit, LLC (9648); and JACM Holdings, Inc. (1445).  The Debtors' address is 4022 East Conant Street Long Beach, CA 90808.

[2]   Capitalized terms used but not otherwise defined herein have the meanings ascribed to such terms in the Motion.

First Day Declaration, and the Interim Order, as approved by this Court; and this Court having

jurisdiction to consider the Motion and the relief requested therein in accordance with 28 U.S.C.

§§ 157 and 1334 and the *Amended Standing Order of Reference* from the United States District

Court for the District of Delaware, dated February 29, 2012; and this Court having found that this

is a core proceeding pursuant to 28 U.S.C. § 157(b)(2) and that this Court may enter a final order

consistent with Article III of the United States Constitution; and this Court having found that venue

of this proceeding and the Motion in this district is proper pursuant to 28 U.S.C. §§ 1408 and 1409;

and it appearing that proper and adequate notice of the Motion has been given and that no other or

further notice is necessary; and upon the record herein; and after due deliberation thereon; and this

Court having determined that there is good and sufficient cause for the relief granted in this Final

Order, therefore, it is hereby

**ORDERED, ADJUDGED AND DECREED THAT:**

1.       The Motion is granted on a final basis, as set forth herein.

2.       All objections to the entry of this Final Order, to the extent not withdrawn or settled,

are overruled.

3.       The Debtors are authorized but not directed, in their discretion and business

judgment, to pay or otherwise honor all prepetition Workforce Obligations and Administrator Fees

and Expenses, on a final basis, provided such payments shall not exceed the amounts set forth in

the table below without further order of this Court.

| Obligation | Approximate Final Amounts |
|---|:---:|
| **Workforce Obligations** | $5,537,000 |
| a.  Wage Obligations | $2,525,000 |
| b.  Deductions | $300,000 |
| c.  ESPP | $143,000 |
| d.  Employee Benefits Obligations | $1,199,000 |
| e.  PTO Obligations | $1,200,000 |
| f.  Reimbursable Expense Obligations | $175,000 |
| g.  Miscellaneous Benefits Obligations | $75,000 |
| **Administrator Fees and Expenses** | $80,000 |
| **GRAND TOTAL** | **$5,617,000** |

4.      The Debtors are authorized to (a) continue each of the Workforce Programs, in the ordinary course of business during the pendency of the Chapter 11 Cases, in the manner and to the extent that such Workforce Programs were in effect, as described in the Motion, immediately before the filing of the Chapter 11 Cases, and (b) continue to fund and to make payments in connection with the costs of and the expenses incurred in the administration of any Workforce Program in the ordinary course of business.

5.      The Debtors are authorized to pay any and all local, state, and federal withholding and payroll-related or similar taxes related to the Workforce Obligations and to withhold and pay amounts that are attributable to the Deductions, including, but not limited to, all withholding taxes, social security taxes, and Medicare taxes, whether such taxes relate to the period before or after the Petition Date.

6.      Subject to the following proviso, the Debtors are authorized but not directed, pursuant to sections 363 and 503(c) of the Bankruptcy Code to continue the Severance Benefits on a postpetition basis in the ordinary course of business, and in each case to pay any accrued amounts thereunder as they become due; *provided that* (a) payments of prepetition Severance

30243354.2

3

Benefits to any individual former Employee terminated prepetition shall not exceed the priority cap set forth in section 507(a)(4) and 507(a)(5) of the Bankruptcy Code, and (b) nothing in this Final Order shall be deemed to authorize the payment of any amounts in satisfaction of retention bonus or severance obligations that are prohibited by section 503(c) of the Bankruptcy Code.

7.      Nothing herein shall be deemed to authorize the Debtors to cash out any PSSL or PTO time except upon termination of an employee, if applicable state law requires such payment.

8.      The Debtors shall provide schedules to the Office of the United States Trustee for the District of Delaware, counsel to any statutory committee appointed in these Chapter 11 Cases, and counsel to the DIP Secured Parties of all payments made on account of all prepetition Workforce Obligations and Administrator Fees and Expenses made by the Debtors pursuant to this Interim Order and within 30 days of any such payment.

9.      The Banks shall be, and are hereby authorized, when requested by the Debtors, to process, honor, pay, and, if necessary, reissue any and all checks or electronic funds transfers on account of obligations authorized to be paid by this Final Order, including prepetition checks and electronic payment and transfer requests that the Debtors reissue or re-request postpetition, drawn on the Debtors' accounts, whether those checks were presented before or after the Petition Date, provided that sufficient funds are available in such accounts to make the payments.

10.     The Banks may rely on the representations of the Debtors with respect to whether any check or other transfer drawn or issued by the Debtors before the Petition Date should be honored pursuant to this Final Order, and the Banks shall not have any liability to any party for relying on such representations by the Debtors as provided for in this Final Order.

11.     The Debtors are authorized but not directed to issue new postpetition checks, or effect new electronic funds transfers on account of amounts payments authorized to be made by

this Final Order, to replace any prepetition checks or electronic fund transfer requests that may be lost or dishonored as a result of the commencement of the Chapter 11 Cases.

12.     Any authorization under this Final Order to pay, and the payment of, any amounts on account of the Workforce Obligations shall not affect the Debtors' right to contest the amount or validity of any Workforce Obligation, including without limitation, any amounts that may be due to any taxing authority.

13.     Notwithstanding anything to the contrary in this Final Order, the Debtors retain their right to modify or terminate any Workforce Program to the extent that such right exists under the terms of the Workforce Program or as may be required by applicable law; *provided, however*, that the Debtors shall seek court approval, upon a motion on notice, of any modification that would implicate any portion of section 503(c) of the Bankruptcy Code.

14.     Nothing in the Motion or this Final Order, nor any actions or payments made by the Debtors pursuant to this Final Order, is intended as or shall be construed or deemed to be: (a) an admission as to the validity of any claim against the Debtors or the existence of any lien against the Debtors' properties; (b) a waiver of the Debtors' rights to dispute any claim or lien on any grounds; (c) a promise to pay any claim; (d) an implication or admission that any particular claim would constitute an allowed claim; (e) an assumption or rejection of any executory contract or unexpired lease pursuant to section 365 of the Bankruptcy Code; (f) a limitation on the Debtors' rights under section 365 of the Bankruptcy Code to assume or reject any executory contract with any party subject to this Final Order; or (g) a waiver or limitation of any claims, causes of action or other rights of the Debtors, or any other party in interest against any person or entity under the Bankruptcy Code or any other applicable law.  Nothing contained in this Final Order shall

be deemed to increase, decrease, reclassify, elevate to an administrative expense status, or otherwise affect any claim to the extent it is not paid.

16. 15. Notwithstanding Bankruptcy Rule 6004(h), to the extent applicable, this Final Order shall be effective and enforceable immediately upon entry hereof.

16. The Debtors are hereby authorized to take such actions and to execute such documents as may be reasonably necessary to implement the relief granted by this Final Order.

17. This Court retains exclusive jurisdiction with respect to all matters arising from or related to the implementation, interpretation, and enforcement of this Final Order.

30243354.2

6