**IN THE UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF DELAWARE**

------------------------------------------------------- x
:
In re:                                                                         :    Chapter 11
:
VIRGIN ORBIT HOLDINGS, INC., *et al.*,[1]    :    Case No. 23-10405 (___)
:
           Debtors.                               :    (Joint Administration Requested)
:
------------------------------------------------------- x

**DECLARATION OF DAVID S. ZUBRICKI IN SUPPORT
OF MOTION OF DEBTORS FOR ENTRY OF INTERIM AND FINAL ORDERS
(A) AUTHORIZING DEBTORS TO OBTAIN POSTPETITION FINANCING,
(B) AUTHORIZING DEBTORS TO USE CASH COLLATERAL, (C) GRANTING
LIENS AND PROVIDING SUPERPRIORITY ADMINISTRATIVE EXPENSE CLAIMS,
(D) GRANTING ADEQUATE PROTECTION, (E) MODIFYING AUTOMATIC STAY,
(F) SCHEDULING A FINAL HEARING, AND (G) GRANTING RELATED RELIEF**

I, David S. Zubricki, hereby declare as follows under penalty of perjury:

1. I am a Director at Ducera Partners LLC ("**Ducera**"), and a registered representative of Ducera Securities LLC, which maintains its principal office at 11 Times Square, 36th Floor, New York, New York 10036. Ducera is the proposed investment banker to the above-captioned debtors and debtors in possession (collectively, the "**Debtors**").

2. I submit this declaration ("**Declaration**") on behalf of the Debtors in support of the *Motion of Debtors for Entry of Interim and Final Orders (A) Authorizing Debtors to Obtain Postpetition Financing, (B) Authorizing Debtors to Use Cash Collateral, (C) Granting Liens And Providing Superpriority Administrative Expense Claims, (D) Granting Adequate Protection, (E)*

---

[1] The Debtors in these cases, along with the last four digits of each debtor's federal tax identification number, are: Virgin Orbit Holdings, Inc. (6914); Virgin Orbit National Systems, LLC (3801); Vieco USA, Inc. (0492); Virgin Orbit, LLC (9648); and JACM Holdings, Inc. (1445). The Debtors' address is 4022 East Conant Street, Long Beach, CA 90808.

*Modifying Automatic Stay, (F) Scheduling A Final Hearing, And (G) Granting Related Relief* (the "**DIP Motion**").[2]

3. In particular, I submit this Declaration in support of my belief that: (a) the Debtors are currently unable to borrow funds on an unsecured or junior basis, or solely secured by the Debtors' unencumbered assets, if any, in amounts sufficient to fund these Chapter 11 Cases; (b) the proposed DIP Facility, (i) is the product of an arm's-length, good faith negotiation process, and (ii) is the best and only currently available postpetition financing option for the Debtors under the circumstances; and (c) the terms of the proposed DIP Facility (as defined below), taken as a whole, are fair and reasonable under the circumstances.

4. The DIP Motion seeks, among other items, authorization for the Debtors to enter into the proposed DIP Facility, which consists of a superpriority senior secured debtor-in-possession term loan credit facility comprised of new money loans consisting of: (a) an aggregate principal amount of up to $31,600,000 in DIP New Money Loans, of which (i) $12,250,000 is proposed to be available immediately upon entry of the Interim Order, (ii) $15,150,000 is proposed to be available upon entry of the Final Order, and (iii) $4,200,000 in DIP Severance New Money Loans, to be made in one or more fundings, is proposed to be available immediately upon entry of (1) the Interim Order and (2) if any, a postpetition Severance Approval Order; and (b) an aggregate principal amount of up to $42,500,000 in Roll-Up Loans, of which (i) $10,900,000 is proposed to be exchanged immediately upon entry of the Interim Order and (ii) $31,600,000 is proposed to be exchanged upon entry of the Final Order (collectively, the "**DIP Loans**"). In addition, the DIP

---

[2] Capitalized terms used but not otherwise defined in this Declaration shall have the meanings used in the DIP Motion and the *Declaration of Daniel M. Hart in Support of Chapter 11 Petitions and First Day Pleadings* (the "**Hart First Day Declaration**") and the *Declaration of Brian Whittman in Support of Chapter 11 Petitions and First Day Pleadings* (the "**Whittman First Day Declaration**" and, together with the Hart First Day Declaration, the "**First Day Declarations**").

Motion seeks authorization for the use of Cash Collateral of the Prepetition Secured Party and provides adequate protection for the Prepetition Secured Party to the extent of any diminution in value of its interests in the Prepetition Collateral (including Cash Collateral) resulting from the any diminution in value resulting from the imposition of the Automatic Stay, the Debtors' use, sale, or lease of the Prepetition Collateral (including Cash Collateral), and the priming of its interests in the Prepetition Collateral (including Cash Collateral).  The proposed DIP Facility and use of Cash Collateral are anticipated to provide the Debtors with sufficient working capital and liquidity to preserve the value of their assets and run an orderly sale process during these Chapter 11 Cases to maximize value for the benefit of all parties in interest.

5.  Unless otherwise stated herein, all statements set forth in this Declaration are based upon (a) my experiences in chapter 11 cases, including with DIP financing facilities, (b) the DIP Motion, (c) the First Day Declarations, (d) certain of the Debtors' financial statements and reports, (e) documents related to the proposed DIP Facility, (f) Ducera's analyses regarding the proposed DIP Facility and DIP financings in other chapter 11 cases, (g) discussions with the Debtors' management concerning the Debtors' business and finances, (h) discussions with, and proposals by, prospective sources of DIP financing, (i) discussions with certain other professionals at Ducera and other advisors to the Debtors, and/or (j) my opinions based upon my experience and knowledge.

6.  I am over the age of 18 and authorized to submit this Declaration on behalf of the Debtors.  I am not being specifically compensated for this testimony other than through payments received by Ducera, as a proposed professional to be retained by the Debtors.  If called upon to testify, I could and would testify as to the facts set forth herein.

7.      In connection with the Debtors' efforts to consider potential alternatives to address liquidity needs, on March 8, 2023, the Debtors retained Ducera to assist with evaluating strategic alternatives, including the prospect of the Debtors entering into debtor-in-possession ("**DIP**") financing.  Immediately following its retention by the Debtors, Ducera commenced a marketing process aimed at obtaining DIP financing for the Debtors that would provide them with sufficient runway to properly position the business for the proposed in-court sale process.  While the Debtors received interest from certain parties, no bids on terms equal to or more favorable than those in the proposed DIP Facility were received.

8.      Based on the Debtors' and their advisors' efforts to secure postpetition financing, there are no viable alternative sources of DIP financing currently available to the Debtors, other than the proposed DIP Facility.  In addition, following conversations with potential lenders, it became clear that no party was willing to extend unsecured or junior secured credit to the Debtors, which would be allowable as an administrative expense under Section 503(b)(1) of the Bankruptcy Code.  As further explained below, based on my experience in raising DIP financing, current market conditions, the Debtors' circumstances, and the negotiations around the proposed DIP Facility, I believe that the proposed DIP Facility represents the best and, importantly, the only option currently available to address the Debtors' liquidity needs and create a pathway to exit from chapter 11.

## BACKGROUND AND QUALIFICATIONS

9.      Ducera is an investment banking firm specializing in providing leading-edge capital structure and restructuring advice to companies, creditors, and investors in bankruptcy.  Ducera provides a broad range of corporate and financial services to its clients, including: (a) general corporate advice; (b) mergers, acquisitions, and divestitures; (c) corporate restructurings; and

(d) private placements. Ducera and its senior professionals have extensive experience in the reorganization and restructuring of distressed companies, both out-of-court and in chapter 11 cases. Ducera's business reorganization professionals have served as financial and strategic advisors in numerous cases, including, among others: (a) *In re Core Scientific, Inc.*, Case No. 22-90341 (DRJ) (Bankr. S.D. Tex. March 13, 2023) [Docket No. 675]; (b) *In re Endo Int'l plc.*, Case No. 22-22549 (JLG) (Bankr. S.D.N.Y. Oct. 25, 2022) [Docket No. 527]; (c) *In re GBG USA Inc.*, Case No. 21-11369 (MEW) (Bankr. S.D.N.Y. Sept. 22, 2021) [Docket No. 230]; (d) *In re Mallinckrodt plc*, Case No. 20-12522 (JTD) (Bankr. D. Del. Mar. 16, 2021) [Docket No. 1741]; (e) *In re Superior Energy Servs., Inc., et al.*, Case No. 20-35812 (DRJ) (Bankr. S.D. Tex. Feb. 2, 2021) [Docket No. 316]; (f) *In re Remington Outdoor Co.*, Case No. 20-81688 (CRJ11) (Bankr. N.D. Ala. Aug. 11, 2020) [Docket No. 283]; (g) *In re Imerys Talc Am., Inc.*, Case No. 19-10289 (LSS) (Bankr. D. Del. Aug. 7, 2019) [Docket No. 927]; (h) *In re Paniolo Cable Co., LLC*, Case No. 18-01319 (RJF) (Bankr. D. Haw. May 7, 2019) [Docket No. 121]; (i) *In re Specialty Retail Shops Holding Corp.*, Case No. 19-80064 (TLS) (Bankr. D. Neb. Jan. 25, 2019) [Docket No. 185]; (j) *In re Sungevity*, *Inc.*, Case No. 17-10561 (KG) (Bankr. D. Del. Apr. 10, 2017) [Docket No. 202]; (k) *In re Toys "R" Us, Inc.*, Case No. 17-34665 (KLP) (Bankr. E.D. Va. Jan. 26, 2018) [Docket No. 1624]; (l) *In re Panda Temple Power, LLC,* Case No. 17-10839 (LSS) (Bankr. D. Del. May 25, 2017) [Docket No. 164]; (m) *In re Dacco Transmission Parts (NY), Inc.*, Case No. 16- 13245 (MKV) (Bankr. S.D.N.Y. Jan. 17, 2017) [Docket No. 205]; (n) *In re Hercules Offshore, Inc.*, Case No. 16-11385 (KJC) (Bankr. D. Del. Aug. 23, 2016) [Docket No. 334]; (o) *In re Illinois Power Generating Co.*, Case No. 16-36326 (MI) (Bankr. S.D. Tex. Jan. 25, 2017) [Docket No. 169]; and (p) *In re Paragon Offshore PLC*, Case No. 16-10386 (JKS) (Bankr. D. Del. May 16, 2017) [Docket No. 1503].

10. I have advised companies, creditors, investors, and financial sponsors across several industries on a range of in-court and out-of-court restructurings, financings, and M&A transactions, in traditional and distressed situations. In connection therewith, I have marketed, structured, evaluated and negotiated debtor-in-possession financing facilities, exit financing facilities, and other debt facilities. My restructuring engagements include: The Greenrose Holding Company (out-of-court restructuring), *In re Intelsat S.A., et al.*, Case No. 20-32299 (KLP) (Bankr. E.D. Va. 2020), American Bridge (out-of-court restructuring), *In re JCK Legacy Company, et al. (f/k/a The McClatchy Company)*, Case No. 20-10418 (MEW) (Bankr. S.D.N.Y. 2020), One Call (out-of-court restructuring), *In re LSC Communications, Inc., et al.*, Case No. 20-10950 (SHL) (Bankr. S.D.N.Y. 2020), *In re NPC International, Inc.*, Case No. 20-33353 (DRJ) (Bankr. S.D. Tex. 2020), Loudpack (out-of-court restructuring), *In re Nine West Holdings, Inc., et al.*, Case No. 18-10947 (SCC) (Bankr. S.D.N.Y. 2018), FTE Networks (out-of-court restructuring), *In re Global Brokerage, Inc.*, Case No. 17-13532 (MEW) (Bankr. S.D.N.Y. 2017), Sears Holdings (out-of-court restructuring), *In re BPS US Holdings Inc., et al.*, Case No. 16-12373 (KJC) (Bankr. D. Del. 2016), *In re Horsehead Holding Corporation, et al.*, Case No. 16-10287 (CSS) (Bankr. D. Del. 2016), *In re The Dolan Company*, Case No. 14-10614 (BLS) (Bankr. D. Del. 2014), *In re GSE Environmental, Inc. et al.*, Case No. 14-11126 (MFW) (Bankr. D. Del. 2014), *In re First Mariner Bancorp*, Case No. 14-11952 (DER) (Bankr. D. Md. 2014), and *In re Caesars Entertainment Operating Company*, Case No. 15-01145 (ABG) (Bankr. N.D. Ill. 2015). Prior to joining Ducera in 2019, I was an Associate at King & Spalding LLP from February 2018 through July 2019. In that capacity, I advised numerous clients in a variety of distressed transactions. Prior to my employment with King & Spalding, between July 2016 and January 2018, I was an Associate in

the Restructuring Group at Centerview Partners, and between October 2013 and June 2016, I was an Associate in the Restructuring Group at Kirkland & Ellis LLP.

11. I received a Bachelor of Arts in History and Government from Dartmouth College and a Juris Doctor from Northwestern University School of Law. I currently hold the Series 79 and Series 63 securities licenses.

12. I am a member of the Ducera professional team assisting the Debtors and, in connection with the Debtors' proposed use of Cash Collateral and the proposed DIP Facility. I participated directly in discussions, due diligence, and negotiations with potential sources of DIP financing, including with regard to the proposed DIP Facility. In doing so, I worked closely with the Debtors' management, external legal counsel, and other advisors.

## THE PROPOSED DIP FACILITY REPRESENTS THE BEST AND ONLY POSTPETITION FINANCING OPTION CURRENTLY AVAILABLE TO THE DEBTORS UNDER THE CIRCUMSTANCES

13. Following its retention by the Debtors, in early March 2023, Ducera moved expeditiously to seek the best financing proposals available in the market. Accordingly, Ducera approached several prospective lenders to gauge interest level and prospective key terms. Such parties included a wide range of potential lenders, including financial parties that routinely provide DIP financing as well as certain strategic parties that had previously expressed an interest in pursuing a strategic transaction with the Debtors. I, along with other members of the Ducera team, explored a variety of potential financing solutions with these potential lenders, including: (a) refinancing the Prepetition Secured Party's existing interests under the Prepetition Notes in addition to providing DIP financing; (b) providing DIP financing on a junior basis; and (c) providing priming DIP financing. In total, Ducera contacted 48 potential lenders and held initial calls with over 20 of such parties. Thereafter, nine (9) potential lenders executed non-disclosure agreements and received confidential information through access to a virtual data room.

Ultimately, the Debtors only received one term sheet for a proposed DIP financing, which was from the DIP Lenders and which was the starting point for negotiations surrounding what became the proposed DIP Facility.

14. During Ducera's discussions with potential financing partners, a handful of concerns were consistently voiced, including: (a) overall market conditions creating a challenging environment for potential lenders; (b) lack of familiarity with the Debtors' niche industry; (c) lack of appetite to pursue a contested priming DIP or junior DIP; and (d) lack of visibility into the residual value of the Debtors' assets, including inventory and equipment. Thus, ultimately, the Debtors and their advisors were unable to identify viable alternatives that would provide sufficient liquidity to the Debtors to purpose the proposed sale path.

15. During discussions with the DIP Lenders' advisors about the Debtors' additional financing needs in the weeks leading up to these Chapter 11 Cases, it became clear that the DIP Lenders—who hold substantially all of the Debtors' prepetition funded debt, with first liens on the collateral securing such funded debt—would not consent to the Debtors' incurrence of financing by any other party having priming liens on the collateral securing the obligations to the Prepetition Lenders. In light of the fact that the Debtors have few, if any, unencumbered assets which could otherwise be used to collateralize postpetition financing in an amount sufficient to meet the Debtors' working capital needs, no third party ultimately agreed to either: (a) provide postpetition financing on an unsecured, *pari passu*, or junior-lien basis to the Prepetition Secured Party; (b) otherwise refinance the Prepetition Notes to avoid a costly and protracted non-consensual priming fight with the Prepetition Secured Party; or (c) provide DIP financing on terms that would attempt to prime the Prepetition Secured Party.

16. In summary, I believe that the proposed DIP Facility is both necessary because it provides the funding required to fund these chapter 11 cases and continue the Debtors' business and represents the best and *only* possible postpetition financing option currently available to the Debtors. There are no significant unencumbered assets to lend against and there are no lenders willing to lend on a junior basis or refinance the Prepetition Notes. Absent approval of the proposed DIP Facility, the Debtors will risk value destruction and the proposed sale process to be conducted during the Chapter 11 Cases will be handicapped before it can begin in earnest. In light of the Debtors' inability to gain access to financing from potential third-party lenders, I believe that, given the Debtors' circumstances, the proposed DIP Facility with the DIP Lenders is the Debtors' only feasible source for the liquidity they need to navigate the chapter 11 process and position themselves to run a value-maximizing transaction process.

**THE PROPOSED DIP FACILITY WAS
NEGOTIATED IN GOOD FAITH AND AT ARM'S LENGTH**

17. Ducera, along with the Debtors' other advisors, actively negotiated the terms and provisions of the proposed DIP Facility on behalf of the Debtors in the weeks leading up to the Petition Date. The process was marked by extensive negotiations to achieve the best available terms for the Debtors for what ultimately became the final terms of the proposed DIP Facility. During that time, the parties exchanged numerous term sheets and draft documents in an effort to reach the best available terms under the circumstances, and such negotiations resulted in a more favorable DIP facility than the DIP Lenders offered at the outset of the negotiations. The process for negotiating the proposed DIP Facility included review, and ultimately approval, of the proposed DIP Facility by an independent committee of the Board of Directors comprised of Susan

Helms, Katharina McFarland, Alan Carr, and Jill Frizzley (the "**Transaction Committee**").[3] The Transaction Committee was formed to evaluate potential strategic alternatives, including but not limited to any debtor in possession financing and section 363 sale transactions, particularly transactions involving majority shareholders, including Virgin Investments Limited.

18. In connection with the negotiation of the proposed DIP Facility, I had a substantial number of discussions and meetings with the Transaction Committee and the Debtors' management team and advisors regarding the quantum of capital needed, the potential forms that a financing and/or restructuring could take, and the terms of the proposed DIP Facility. Based on those discussions and meetings, my restructuring experience and familiarity with DIP financings, I believe that the proposed DIP Facility was negotiated at arm's length and in good faith and is reasonable and fair under the circumstances of these Chapter 11 Cases.

### THE ECONOMIC TERMS OF THE PROPOSED DIP FACILITY, TAKEN AS A WHOLE, ARE FAIR AND REASONABLE AND WERE A NECESSARY INDUCEMENT FOR THE DIP LENDERS TO PROVIDE THE PROPOSED DIP FACILITY

19. Based on my knowledge of the Debtors' financial position and the financing market at this time, I believe that the economic terms of the proposed DIP Facility: (a) were the subject of arm's-length negotiations with the DIP Lenders; (b) are an integral component of the overall terms of the proposed DIP Facility; and (c) were required by the DIP Lenders as consideration for the proposed DIP Facility. The Debtors and DIP Lenders focused on the DIP size necessary to fund these Chapter 11 Cases and run a fulsome process for the sale of all or substantially all of the

---

[3] The members of the Transaction Committee were appointed to carry out the powers, responsibilities and obligations related to the review, consideration, evaluation, negotiation and approval or rejection of transactions which could implicate certain conflicts of interest with Virgin Group Holdings Limited and its affiliates (other than the Debtors) and certain other interested parties. Susan Helms and Katharina McFarland were appointed to the Transaction Committee on March 10, 2023, and Jill Frizzley and Alan Carr were appointed to the Transaction Committee on March 31, 2023.

Debtors' assets to a third party bidder pursuant to section 363 of the Bankruptcy Code. The DIP Lenders ultimately agreed to provide the proposed DIP Facility, in accordance with the terms and conditions set forth in the DIP Credit Agreement.

20. Based on the negotiations amongst the parties—of which I was involved—it is my understanding that the DIP Lenders agreed to provide the DIP Loans with the specific intent to both fully fund the Debtors' reorganization while simultaneously keeping the postpetition financing narrowly tailored to meet the Debtors' needs at appropriate times. The DIP Lenders and the Debtors, along with their advisors, extensively negotiated the terms of the proposed DIP Facility. Such negotiations included numerous drafts of key documents, including the proposed Interim DIP Order, the DIP Credit Agreement, a term sheet that included key terms exchanged between the parties, and various discussions both amongst key principles and advisors. After the weeks'-long negotiations, I believe that the terms of the proposed DIP Facility, including the fees and conditions contained therein, represent the best available terms for the Debtors. Further, the proceeds from the DIP Facility will allow the Debtors to pursue a sale process in accordance with the specific milestones in the DIP Documents.

21. As a further condition to entry into the proposed DIP Facility, I understand that the DIP Lenders required termination of certain trademark licenses used by the Debtors in their business. The Debtors and their advisors negotiated the terms of an agreement to phase out usage of the licenses (the "**Termination Agreement**") at arm's length and the Termination Agreement was entered into on April 2, 2023.

22. The proposed DIP Facility provides for various fees and postpetition liens, which were expressly required by the DIP Lenders as a condition to providing the proposed DIP Facility on the terms set forth in the DIP Documents and are, I understand, an integral component of the

DIP Lenders' provision of the proposed DIP Facility. As set forth in the DIP Motion, these fees and rates include the following:

- *Upfront Fees*: (a) 3.00% of the aggregate principal amount of DIP Interim New Money Loans, due and payable on the Closing Date, (b) 3.00% of the aggregate principal amount of DIP Final New Money Loans, due and payable on the Final Funding Date, (c) 3.00% of the aggregate principal amount of Severance New Money Loans, due and payable on the Severance Funding Date; and (d) 3.00% of the aggregate principal amount of Prepetition Bridge Note, due and payable on the Closing Date.

- *Interest Rate*: (a) an interest rate of 12.00% per annum for the DIP New Money Loans and (b) an interest rate of 18.00% per annum for the Roll-Up Loans.

23. The fees, liens and rates as set forth in the DIP Documents were each subject to arm's-length negotiations, and I believe that they are, taken as a whole and given the Debtors' capital structure, based on my prior experience, reasonable and fair under the circumstances of these Chapter 11 Cases.

## THE ROLL-UP LOANS CONSTITUTED A REQUIRED TERM OF THE PROPOSED DIP FACILITY

24. The Prepetition Notes, including the Prepetition Bridge Note, provided the Debtors with much-needed liquidity during the several months leading up to the Petition Date, which allowed the Debtors to avoid having to prematurely file for chapter 11 and thereby afforded the Debtors more time to pursue an out-of-court transaction. The Prepetition Notes also offered the Debtors a bridge to a potential in-court transaction, such as a sale under section 363 of the Bankruptcy Code, which Ducera and the Debtors' other advisors and management team continue to explore and pursue and, the Prepetition Bridge Note, in particular, allowed the Debtors to complete their reduction in force while making all termination payments to severed employees. Thus, without such financing, the Debtors would have been unable to engage in contingency planning and may have been forced to prematurely file for chapter 11, faced a potential liquidation, and suffered destruction of value at the expense of all stakeholders.

25. Based on my involvement in negotiations and discussions with advisors to the DIP Lenders, it is my understanding that the DIP Lenders would not have provided the proposed DIP Facility absent the Roll-Up Loans. Generally speaking, roll-up loans to refinance prepetition debt, such as those provided under the proposed DIP Facility, are a common feature of debtor-in-possession financing agreements. Inclusion of the amounts due under the Prepetition Notes in the Roll-Up Loans were: (a) an essential inducement of the DIP Lenders' willingness to provide $31,600,000 in DIP New Money Loans to the Debtors postpetition and a DIP facility sufficiently large to fund the Debtors' chapter 11 sale process; and (b) a condition of the Prepetition Secured Party consenting to (i) forbear from exercising its rights and remedies under the Prepetition Notes and (ii) agree to subordinate its claims to the proposed DIP Facility.

26. For the avoidance of doubt, I also believe that inclusion of the debt under the Prepetition Bridge Note in the Roll-Up Loans is appropriate. The Prepetition Bridge Note was, in effect, a "pre-DIP" facility that existed to fund termination payments for hundreds of the Debtors' employees. The inclusion of the Prepetition Bridge note in the Roll-Up Loans provided the Prepetition Secured Party comfort during the DIP negotiation process that it would not be penalized for providing the Debtors, and their former employees, crucial funding as the Debtors prepared to file for chapter 11.

27. Based on the negotiations of the proposed DIP Facility, I believe that the roll-up of the Roll-Up Loans is fair, reasonable, and a necessary inducement for the DIP Lenders to agree to enter into the proposed DIP Facility with this tenor, and in a sufficient amount, and consent to use of Cash Collateral, each of which is essential to the viability of the Chapter 11 Cases and the Debtors' ultimate successful sale process. Based on my discussions and meetings with the Debtors' management team and advisors, I understand that absent approval of the Roll-Up Loans,

the DIP Lenders may not have agreed to enter into the proposed DIP Facility, which would have left the Debtors with limited or, more likely, no options to maximize value for its stakeholders.

## ACCESS TO CASH COLLATERAL IS CRITICAL

28.     I believe that it is essential to the ultimate success of these Chapter 11 Cases that the Debtors receive immediate authority and access to use Cash Collateral.  Based on my extensive discussions with the Debtors and their other advisors, my review of their financial projections, and my assessment of their liquidity position and working capital needs, I understand that the Debtors have an urgent need for the use of the Cash Collateral to, among other things, fund a fulsome 363 sale process.  I believe that, absent such relief, the Debtors will not have sufficient liquidity to properly market their business, with damaging consequences for all stakeholders.

29.     In connection therewith, the Debtors and the DIP Lenders engaged in exhaustive, arm's-length negotiations that culminated in the agreed upon terms of the proposed adequate protection package in the proposed DIP Facility as reflected in the Interim Order.  I believe that the terms of the proposed adequate protection package and concessions made therein, taken as a whole, are appropriate and reasonable under the circumstances, particularly in light of my view that no alternative financing is currently available.

## CONCLUSION

30.     As described herein, it is my belief that the proposed DIP Facility represents the best and only postpetition financing option available to the Debtors to provide for the Debtors' immediate liquidity needs under the circumstances of these Chapter 11 Cases and that the terms and conditions of the proposed DIP Facility, taken as a whole, are fair and reasonable.  Also, I believe that the terms of the proposed adequate protection package, taken as a whole, are reasonable under the circumstances.  The preservation of the estates' assets, and their ability to

successfully maximize value for stakeholders depend heavily upon the expeditious approval of the relief requested in the DIP Motion. Accordingly, I respectfully submit that the Court should approve the proposed DIP Facility.

[*Remainder of page left intentionally blank*]

I declare under penalty of perjury that, to the best of my knowledge and after reasonable inquiry, the foregoing is true and correct.

Dated: April 4, 2023

/s/ David S. Zubricki
David S. Zubricki
Director
Ducera Partners LLC